COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





ERIC ANDREW ZIEGLER,

                                    Appellant,

v.

THE STATE OF TEXAS,

                                    Appellee. 

§
 
§
 
§
 
§
 
§

§


No. 08-09-00188-CR

Appeal from
 416th District Court

of Collin County, Texas

(TC # 416-81736-08)



 

 

 




O P I N I O N

            Eric Andrew Ziegler appeals his conviction of murder, enhanced by two prior felony
convictions. A jury found Appellant guilty, found both enhancement paragraphs true, and assessed
his punishment at life imprisonment. We affirm.
FACTUAL SUMMARY
            On June 13, 2008, Appellant was residing with James Matisi at his home in Richardson,
Texas. In an effort to assist Appellant, Matisi provided Appellant with a place to stay, food,
clothing, and a cell phone. Matisi went to Sherman that evening to pick up his ten-year-old son,
Jimmy, because it was Father’s Day weekend. When they returned to the house, Matisi saw broken
glass at the bottom of the stairs. He went upstairs to find Appellant and noticed blood in the master
bedroom on the carpet, dresser, and walls. Matisi found Appellant in the master bath with a belt
wrapped tightly around his arm like a tourniquet. Appellant had cut his pinky finger. Appellant was
agitated and initially would not remove the belt even though his hand was swollen and the bleeding
had stopped. Matisi helped Appellant bandage the wound and finally convinced him to remove the
belt. Matisi yelled at Appellant for getting blood everywhere and told him to go to his bedroom. 
After fixing dinner for Jimmy, Matisi cleaned up the blood while Jimmy played video games. 
Appellant came into the bathroom where Matisi was cleaning and apologized for making a mess but
he was also upset that Matisi was more concerned about the mess than his injury.
            Later that evening, Jimmy was hungry and Appellant volunteered to go pick up something
for him. Appellant did not have his own vehicle so he borrowed Matisi’s truck. Matisi fell asleep
and did not wake up until after Appellant returned. He found Appellant in his bedroom with Ivonne
Zamudio and Timothy “Chicago” Jones. Matisi was upset that Appellant had brought people to the
house and he told Appellant privately that they needed to leave. They returned to the room and
Matisi smoked crack with the group for a while. Matisi explained that he was afraid of Jones and
hoped that if he went along with them they would leave. Jones asked Matisi for the belt which
Appellant had used as a tourniquet because it was his belt. Matisi handed Jones the belt and he
wrapped it around Zamudio’s neck and began choking her with it for fifteen to twenty seconds. At
trial, Matisi described the effort employed by Jones as somewhere between playful and forceful, but
he told the police during an interview that Jones was “intense.” When Zamudio said she did not
think they were going to do that, Matisi interpreted Jones’ actions as some kind of sexual play. Jones
stopped when Appellant shook his head and waved his hand back and forth.
            A short time after the choking incident, Appellant and Zamudio went into the bathroom. 
Matisi left the bedroom to check on Jimmy and found him still playing video games. He also went
to his master bedroom to make sure Appellant had not taken his gun but it was still in the dresser
where Matisi stored it. Matisi then found Appellant, Jones, and Zamudio in the bathroom. 
Appellant was standing behind Zamudio in the shower and Jones was standing outside of the shower. 
Both Appellant and Zamudio were fully clothed while Jones was in his boxer shorts. Matisi told
Appellant that he had to get Jones and Zamudio out of the house and he left the bathroom. Matisi
told Jimmy to get ready for bed. When he walked by the bathroom, Matisi could see the light on in
the guest bathroom and he heard water running. Matisi returned to his bedroom. 
            Sometime after Jimmy had fallen asleep in the master bedroom, Appellant came to the
bedroom and asked Matisi for a condom. Matisi gave him one and Appellant left. Matisi could hear
the water still running in the bathroom. A few minutes later, Matisi heard Zamudio state, “No, stop,
don’t do that.” Fifteen minutes later, Appellant returned to the master bedroom naked and wet. He
said, “I think I hurt the girl. I think I broke her leg. She’s still breathing. How do I stop her from
breathing?” Matisi did not believe Appellant and told him that it was his problem, to take care of
it, and to get Jones and Zamudio out of the house. Appellant left the bedroom. Matisi did not call
911 because he was afraid of Jones. He instead barricaded the bedroom door and went to sleep.
            Matisi woke up at 7 a.m., opened the bedroom door, and looked across at Appellant’s
bedroom. He saw Appellant staring at the wall and smiling. Because of Appellant’s demeanor,
Matisi became concerned that Appellant had actually killed Zamudio. Matisi returned to his
bedroom, closed the door, and retrieved his gun. He was initially afraid to call 911 because he
thought Appellant and Jones might hurt him and Jimmy if they found out he had called the police. 
Appellant came to the door to talk but Matisi would not open it and he told Appellant again to get
Zamudio and Jones out of the house. Appellant left but then returned and began stacking against the
door the items Matisi had purchased for him. Matisi next heard the garage door opening and he saw
from the window that Appellant was getting in his truck. After telling Jimmy to call 911, Matisi left
the bedroom and saw Jones alone in the guest bathroom. He continued downstairs and into the
garage and saw Appellant backing out of the driveway. Matisi pointed his gun at Appellant and
ordered him to drive back into the driveway. Appellant complied and went back into the house. 
Appellant went upstairs and into the master bath. Matisi ordered Appellant out of the bedroom and
then barricaded the door again. Both Jimmy and Matisi talked to the 911 dispatcher telling him that
they thought a woman had been killed in the house about two hours earlier. Matisi told the
dispatcher at one point that he believed Jones, rather than Appellant, had killed the woman. The
police arrived a short time later and Matisi gave them consent to search his house.
            Three Richardson police officers went to the residence in response to the 911 call. They
opened the front door and heard an individual, later identified as Jones, standing at the top of the
stairwell yelling at them to leave. Jones refused to come downstairs so the officers entered. Officer
Ramon Nieto heard a door close near the top of the stairs. The officers proceeded upstairs and found
Jones standing in the bathroom wearing only a belt. Two of the officers had to take Jones to the
floor in order to handcuff him. Nieto next went into the master bedroom where he found Matisi and
Jimmy hiding in the closet. The officers then found Appellant on the bed in a bedroom. Appellant
appeared to be asleep and the officers had to wake him up.
            Officer Mike Wieczorek spoke with Appellant outside of the residence. When Appellant saw
Jones leaving the house with paramedics,


 he told Wieczorek that he was afraid of Jones, did not
know him, and did not know how he had gotten in the house. He also said he did not know anything
about a female being inside of the house. Appellant also indicated surprise that the police were at
the house and asked Wieczorek what was happening. After speaking with Appellant for a while and
observing his mood swings and excitability, Wieczorek formed the opinion that Appellant was
intoxicated. Appellant’s behavior was consistent with drug use. Because Matisi would not allow
Appellant back in the residence, Wieczorek placed Appellant under arrest for public intoxication and
began transporting him to jail. During the drive, Appellant was agitated and kept moving around
and stretching as though he was trying to get out of the handcuffs.
            After all of the civilians had been escorted out of the residence, Nieto went back inside and
found several garbage bags in the bathroom where they had found Jones. One of the bags contained
women’s clothing. Nieto looked inside another bag and saw a human head without eyes. Body parts
were found in three of the garbage bags. The remains were later identified as Ivonne Zamudio. The
police also found a crack pipe in the guest bath, a shower rod across the sink and vanity in the guest
bath, a camouflage knife in the sink in the master bath, and a baggie full of needles. Another officer
went to the hospital with Jones and collected the belt worn by him.
            Dr. William Rohr, the medical examiner, performed a modified autopsy on Zamudio’s
remains. He determined that her body had been disarticulated and mutilated post-mortem.
Zamudio’s tattoos had been removed and her genitals had been cut from the body. Dr. Rohr
concluded that the victim’s death had been caused by manual or ligature strangulation, or by other
homicidal violence, which could include smothering or drowning. 
            The victim’s tissue was found on the camouflage knife. Additionally, the DNA of Appellant,
the victim, and one additional contributor was found on the knife. The belt worn by Jones at the time
of his arrest contained the DNA of the victim, Appellant, and two other contributors. The victim’s
DNA was found under Jones’ fingernails. Matisi did not have the DNA of any other person under
his nails. 
            Detective Jules Farmer conducted multiple interviews of Appellant, Jones, and Matisi. In
an interview conducted two days after Appellant’s initial arrest, Appellant told the detectives that
he had driven to Dallas on June 13 to get one of his girlfriends and obtain “party material” to smoke. 
Farmer understood “party materials” to mean drugs. Appellant went to some apartments and saw
Jones and Zamudio, whom he described as a “crack whore.” Appellant invited Zamudio and Jones
to go back to Richardson with him. Appellant drove to another location where he obtained the drugs. 
During a stop in Oak Lawn, Jones asked Zamudio for a sexual favor but she refused and instead
asked Appellant for a hit of crack cocaine. Zamudio agreed to trade sex for crack cocaine, but she
upset Appellant by reneging after smoking the crack. The trio returned to Richardson after stopping
for something to eat. When they arrived at the house, they went into Appellant’s bedroom and began
getting high. Appellant and Zamudio then went into the bathroom and she traded sex for more crack
cocaine. Afterwards, Zamudio returned to the bedroom and Appellant ran into Matisi in the hall. 
Matisi asked Appellant to get Jones and Zamudio out of his house and then accompanied Appellant
into the bedroom. Jones became upset that Zamudio provided sexual favors to Appellant but had
refused him. Appellant claimed to have calmed Jones by talking to him, but at some point during
the evening, Jones grabbed a belt and put it around Zamudio’s neck and began strangling her.
Appellant stopped him and Zamudio indicated that she thought Jones was joking. Later, Appellant
went into the bathroom where Jones and Zamudio were arguing and he saw Jones slapping Zamudio. 
Appellant wanted to give Zamudio a shower because she smelled bad so he took off her clothes. 
Appellant returned to his bedroom to get some shampoo and he asked Matisi for his knife. Appellant
described his knife as having a stainless steel blade and a camouflage handle. Appellant put the
knife in his pocket and returned to the bathroom where he found Zamudio and Jones in the shower. 
Appellant left the bathroom again to talk to Matisi. As they were talking, he heard banging coming
from the bathroom. When he returned to the bathroom, he found Jones choking Zamudio in the tub
which was full of water. Appellant told him to stop, but Jones said that it was too late. At Jones’
request, Appellant retrieved some trashbags from downstairs. After Jones told him that he needed
two hours, Appellant emptied his pockets on the counter and left the bathroom. At another point in
the interview, Appellant said he gave the knife to Jones. 
            Detective Farmer testified that he asked Appellant whether the tub had water in it the first
time he went in and saw Jones holding down Zamudio. Appellant replied, “When I came in there
and I started choking her again, the tub wasn’t full of anything.” Farmer repeated essentially the
same question, and Appellant again said, “When I went in there and started choking her again and
choking her again,” but he stopped and changed the subject to explain how Jones got the knife.
Farmer did not press Appellant on these inculpatory statements because he did not want him to
terminate the interview. After the next break, Farmer became more forceful with the questioning
and Appellant terminated the interview. 
            A grand jury indicted Appellant for the murder of Zamudio. The jury found Appellant guilty
as a principal actor or as a party. At the punishment phase, Appellant pled true to both enhancement
paragraphs. The State also introduced evidence establishing Appellant had several other
misdemeanor and felony convictions. This appeal follows.
ADMISSION OF VIDEOTAPED STATEMENT
            In Issue One, Appellant argues the trial court abused its discretion by admitting the entire
videotaped statement after he invoked his right to counsel. The State responds that Appellant
requested counsel only for a narrow purpose and not as a pre-condition to speaking with the police.
Standard of Review
            We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard
of review. Amador v. State, 221 S.W .3d 666, 673 (Tex.Crim.App. 2007). We give almost total
deference to a trial court’s rulings on questions of historical fact and application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor, but we review de novo
application-of-law-to-fact questions that do not turn on credibility and demeanor. Amador, 221
S.W.3d at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex.Crim.App. 2005).
            When the trial court has not made a finding on a relevant fact, we view the evidence in the
light most favorable to the trial court’s ruling and assume the trial court made implicit findings of
fact supported by the record. Herrera v. State, 241 S.W.3d 520, 527 (Tex.Crim.App. 2007). We
will uphold the trial court’s ruling if it is reasonably supported by the record and is correct under any
theory of law applicable to the case. State v. Dixon, 206 S.W.3d 587, 590 (Tex.Crim.App. 2006).
Underlying Facts
            The police interviewed Appellant on three occasions. They interviewed him following his
arrest, but Appellant invoked his right to counsel and the police terminated the interview. Two days
later, Appellant reinitiated contact with the police and the police interviewed him for several hours. 
This is the videotaped interview admitted into evidence over Appellant’s objection. When the police
attempted to interview Appellant the following day, Appellant terminated the interview. Appellant
filed a motion to suppress a large portion of the second interview, claiming that the police failed to
terminate the interview after he invoked his right to counsel. 
            Approximately two hours into the second interview, the detectives decided to present
Appellant with a photo array containing the photo of Zamudio, because they wanted to be sure
Appellant was talking about the victim. Before showing Appellant the array, however, the detectives
presented him with written instructions shown to any witness viewing a photo array for the purpose
of identifying a suspect. One of the detectives explained to Appellant that they had only one kind
of form which pertained to identification of the “bad guy” but they were only trying to make sure
they were all talking about the same girl. Appellant read the instructions


 and asked about the
portion which stated “just because a police officer was showing you a group of photographs, that this
should not influence your judgment in any way.” Appellant asked, “your judgment for --?” The
detective explained again that the form is typically used to identify a “bad guy” and the instruction
was intended to tell the witness that just because the officer showed the witness a group of pictures
it did not mean that the bad guy was necessarily in the lineup. He added that they were using the
lineup to make sure Appellant and the detectives were talking about the same girl since Appellant
did not know her name. The following exchange then occurred:
[Appellant]: Could I have maybe an--an attorney maybe break this down in a real
manner to have it with me. Would that be okay? I’m kind of--
 
[Detectives talking over each other]: That’s fine. We don’t have to--
[1st Detective]: We can do that later.
[2nd Detective]: We can do that later.
[Appellant]: Well, I mean, I’ve got no problem--
[1st Detective]: Basically what that says is that the person may not be in there; they
may be in there. You’re under no obligation to pick somebody. We’re just trying--
 
[Appellant]: You’re--you’re going to show me photos and ask me--
[1st Detective]: We’re going to say is the person that was with you one of these six?
[Appellant]: Oh, okay.
Appellant then viewed the array and identified the photo of Zamudio as the woman he had been
speaking about, and the interview continued. The trial court denied the motion to suppress finding
that it was not a clear, unequivocal request for an attorney. 
Limited Request for Counsel
            Under the Fifth Amendment, an accused has a right to have counsel present during custodial
interrogation. Edwards v. Arizona, 451 U.S. 477, 481-82, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378
(1981). Once a suspect has invoked his Fifth Amendment right to counsel, police interrogation must
cease until counsel has been provided or the suspect himself initiates further communication with
the police. State v. Gobert, 275 S.W.3d 888, 892 (Tex.Crim.App. 2009), citing Edwards, 451 U.S.
at 484-85, 101 S.Ct. at 1885.
            Not every mention of a lawyer is sufficient to invoke the Fifth Amendment right to the
presence of counsel during questioning. Gobert, 275 S.W.3d at 892. Officers are not required to
seek clarification or halt questioning if the suspect makes an ambiguous or equivocal statement with
respect to counsel. Id. Whether the mention of a lawyer constitutes a clear invocation of the right
to counsel will depend upon the statement itself and the totality of the surrounding circumstances. 
Id. The court must determine whether the suspect articulated his desire to have counsel present
sufficiently clearly that a reasonable police officer in the circumstances would understand the
statement to be a request for an attorney. Id. at 892-93. The reviewing court examines the totality
of circumstances to determine whether any statement referencing counsel was really a clear
invocation of the Fifth Amendment right. Id. at 893. Finally, when a suspect makes a clear, but
limited, invocation of the right to counsel, the police must honor the limits that are thereby placed
upon the interrogation, but they may question their suspect outside the presence of counsel to the
extent that his clearly expressed limitations permit. Id. at 893, citing Connecticut v. Barrett, 479
U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).
            In Connecticut v. Barrett, the police gave the defendant his Miranda warnings prior to
interviewing him about his involvement in a sexual assault. Connecticut v. Barrett, 479 U.S. at 525,
107 S.Ct. at 830. The defendant stated that “he would not give the police any written statements but
he had no problem in talking about the incident.” Id. The defendant spoke with the officers and
admitted his involvement in the sexual assault. Id. When the officers discovered that the tape
recorder used during the interview had malfunctioned, the police spoke with the defendant a second
time. Id., 479 U.S. at 525-26, 107 S.Ct. at 830. After being given his Miranda warnings again, the
defendant reiterated that “he was willing to talk about [the incident] verbally but he did not want to
put anything in writing until his attorney came.” Id., 479 U.S. at 526, 107 S.Ct. at 830. He then
repeated his confession. Id. When the officers discovered that their tape recorder had again failed
to record the statement, one of the officers reduced to writing his recollection of the defendant’s oral
statements. Id. The trial court found the oral statements admissible, but the Connecticut Supreme
Court reversed, finding that the defendant’s statement served as an invocation of the right to counsel
for all purposes. Id., 479 U.S. at 526-27, 107 S.Ct. at 830-31. The United States Supreme Court
reversed because it found that the defendant’s limited requests for counsel were accompanied by
affirmative announcements of his willingness to speak with the authorities and the officers did not
violate the limited invocation of his right to counsel. Id., 479 U.S. at 529, 107 S.Ct. at 832. 
            It is undisputed that Appellant terminated the first interview but he reinitiated
communications with the police two days later and waived the right to counsel at the beginning of
the second interview. He did not make any request for counsel until the detectives presented him
with the instructions related to a photo lineup. Appellant asserts that his request for counsel to
“break it down for him” was an unequivocal request for counsel for all purposes and the
interrogation should have immediately ceased. We disagree because it takes Appellant’s request for
counsel out of context. The video reflects that Appellant made the request for the limited purpose
of explaining the written instructions. When the detectives stated they would show him the photo
array another time and one of the detectives reached toward Appellant to retrieve the instructions
from his hand, Appellant stated he had “no problem” while pointing to the instructions. One of the
detectives then clarified the process and Appellant indicated he understood while nodding his head
up and down vigorously. At the same time, Appellant returned the instructions to one detective and
indicated with a somewhat exaggerated motioning of his hand for the detective holding the photo
array to give it to him. Appellant viewed the photo array and identified Zamudio’s photograph. The
interview then continued. Appellant’s request for counsel to explain the instructions was not
ambiguous. Therefore, we will not give it the broad interpretation Appellant seeks because doing
so would require us to disregard the ordinary meaning of the request. See Barrett, 479 U.S. at 529-30, 107 S.Ct. at 832. We conclude that Appellant’s limited request for counsel to explain the photo
array instructions did not require the detectives to cease the interrogation immediately nor did the
request render inadmissible the remainder of the interrogation captured on video.


 See Barrett, 479
U.S. at 529, 107 S.Ct. at 832. Issue One is overruled.
LEGAL SUFFICIENCY
            In Issue Two, Appellant challenges the factual sufficiency of the evidence supporting his
conviction. After the parties filed their briefs, the Court of Criminal Appeals held in Brooks v. State
that the Jackson v. Virginia legal-sufficiency standard is the only standard that a reviewing court
should apply in determining whether the evidence is sufficient to support each element of a criminal
offense that the State is required to prove beyond a reasonable doubt. Brooks v. State, 323 S.W.3d
893 (Tex.Crim.App. 2010). Rather than refusing to review Appellant’s issue at all in light of
Brooks, we will review the legal sufficiency of the evidence.
Standard of Review
            In reviewing the legal sufficiency of the evidence to support a conviction, an appellate court
must consider all of the record evidence in the light most favorable to the verdict, and must
determine whether, based on that evidence and reasonable inferences therefrom, any rational trier
of fact could have found the defendant guilty of all the elements of the offense beyond a reasonable
doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
Villarreal v. State, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). This familiar standard gives full
play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the
evidence, and to draw reasonable inferences from basic facts to ultimate facts. Jackson, 443 U.S.
at 319, 99 S.Ct. at 2789; Klein v. State, 273 S.W.3d 297, 302 (Tex.Crim.App. 2008). We consider
all of the evidence, whether admissible or inadmissible. Clayton v. State, 235 S.W.3d 772, 778
(Tex.Crim.App. 2007); Wilson v. State, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). When the record
supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the
prosecution and therefore defer to that determination. Clayton, 235 S.W.3d at 778. The same
standard of review is used for both direct evidence and circumstantial evidence cases. Hooper v.
State, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).
Elements of the Offense
            The indictment alleged that Appellant intentionally and knowingly caused the death of
Zamudio by strangling her with an object, a deadly weapon, the exact nature of which is unknown
to the grand jury, and by manner and means unknown to the grand jurors. See Tex.Penal Code
ann. § 19.02(b)(1)(West 2003). The application paragraph of the court’s charge permitted the jury
to convict Appellant as a principal, or as a party if the jury found that he solicited, encouraged,
directed, aided, or attempted to aid Jones in committing the murder of Zamudio. See Tex.Penal
Code Ann. §§ 7.01, 7.02 (West 2003). The jury returned a general guilty verdict. 
Review of the Evidence
            We begin by examining the sufficiency of the evidence supporting Appellant’s guilt as a
principal. Matisi testified that when he went to bed, Zamudio was with Appellant and Jones in the
bathroom. Some time later, Appellant went into Matisi’s bedroom and asked for a condom. After
a few minutes, Matisi heard Zamudio state, “No, stop, don’t do that.” Fifteen minutes later,
Appellant returned to the master bedroom naked and wet. He told Matisi he had hurt Zamudio and
he wanted to know how to stop her from breathing. 
            The DNA evidence also connected Appellant to the murder and his attempt to dispose of the
body. The knife, which Appellant admitted retrieving from Matisi that evening, had on it the tissue
and DNA of the victim as well as the DNA of Appellant and one additional contributor. The belt
worn by Jones at the time of his arrest bore the DNA of the victim, Appellant, and two other
contributors. Appellant argues that the presence of his DNA on the belt is explainable because he
had used the belt as a tourniquet when he cut his finger. He claims that the presence of his DNA on
the knife should be expected since he regularly carried the knife with him. It was the jury’s task to
resolve the conflicts in the evidence and decide what weight to assign the DNA evidence.
            Appellant made incriminating statements in his second interview. The audio on the DVD
is difficult to hear, but Appellant can be heard on the video stating that Jones choked Zamudio but
Appellant can also be heard stating, “When I went in there and started choking her again and choking
her again....” Appellant attacks the quality of the video recording and urges that it should not be
considered. Even if we could exclude the video evidence from our sufficiency review, Detective
Farmer recounted how Appellant told them during his second interview that he had choked Zamudio. 
Detective Steven Baxter was listening to the interview from outside of the room and he heard
Appellant clearly state he had “strangled” the victim or words to that effect. 
            The evidence also showed that Appellant had a consciousness of guilt. After the police
arrived and secured the scene, Appellant lied to the police when he said he did not know Jones or
how he got into the house, and he did not know anything about a woman being in the house. A
defendant’s conduct in lying to police officers shows a consciousness of guilt, and may be considered
as circumstantial evidence of guilt. King v. State, 29 S.W.3d 556, 565 (Tex.Crim.App. 2000)
(making false statements to cover up crime is evidence indicating a consciousness of guilt and is
admissible to prove commission of offense); Torres v. State, 794 S.W.2d 596, 598 (Tex.App.--Austin 1990, no pet.)(defendant’s conduct after crime indicating consciousness of guilt is “one of
the strongest kinds of evidence of guilt”).
            After considering all of the evidence in the light most favorable to the verdict, we find that
the evidence is legally sufficient to prove beyond a reasonable doubt that Appellant caused
Zamudio’s death as alleged in the indictment. It is therefore unnecessary to review the legal
sufficiency of the evidence supporting Appellant’s guilt as a party. Issue Two is overruled.
ADMISSION OF GRUESOME PHOTOGRAPHS
            In Issue Three, Appellant contends the trial court abused its discretion by admitting five
crime scene photographs and four autopsy photographs because the danger of unfair prejudice
substantially outweighed the probative value. The State responds that the trial court correctly
balanced the relevant factors under Rule 403.
            Rule 403 of the Texas Rules of Evidence provides that relevant evidence may be excluded
if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, or needless presentation of
cumulative evidence. Tex.R.Evid. 403. A court may consider many factors in determining whether
the probative value of photographs is substantially outweighed by the danger of unfair prejudice,
including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they
are in color or black-and-white, whether they are close up, whether the body depicted is clothed or
naked, the availability of other means of proof, and other circumstances unique to the individual
case. Davis v. State, 313 S.W.3d 317, 331 (Tex.Crim.App. 2010); Williams v. State, 301 S.W.3d
675, 690 (Tex.Crim.App. 2009). The admissibility of photographs over an objection is within the
sound discretion of the trial court. Davis, 313 S.W.3d at 331. Autopsy photographs are generally
admissible unless they depict mutilation of the victim caused by the autopsy itself. Id.
            State’s Exhibits 9, 10, 15, 16, and 17 are photographs taken at the crime scene. State’s
Exhibit 9 is a photograph of garbage bags on the bathroom floor taken from a distance of several
feet. The head and internal organs are partially visible. State’s Exhibit 10 is a closer view of the
same garbage bags and body parts State’s Exhibit 15 is a close-up view of the head from a different
angle and depicting a portion of the scalp which has been cut away. State’s Exhibit 16 is a close-up
view of the head depicting the empty eye sockets. State’s Exhibit 17 is a closer view of the bags
containing the limbs and torso. State’s Exhibits 19 through 22 are autopsy photographs. State’s
Exhibit 19 is a photograph of the body parts removed from “Bag 1” on the autopsy table. It shows
the scalped head, eyeball, hair, and tissue fragments. State’s Exhibit 20 is a redacted photo of the
torso and State’s Exhibit 21 is a redacted photo of limbs. Appellant waived any complaint he had
with respect to State’s Exhibits 20 and 21 because he stated that he had no objection to these two
exhibits after the State redacted the photos to show only antemortem injuries. Tex.R.App.P. 33.1. 
The trial court sustained Appellant’s objection to State’s Exhibit 22 and did not admit it into
evidence. Consequently, our review is limited to the remaining five crime scene photographs
(State’s Exhibits 9, 10, 15, 16, and 17) and one autopsy photograph (State’s Exhibit 19). 
            The record reflects that the trial court was extremely cautious in conducting the Rule 403
balancing test with respect to the photographic evidence. The court excluded some photographs and
required the State to redact others. The photographs being reviewed on appeal are 8 1/2 by 11 inches
in size. The trial court did not allow the State to display the exhibits on a larger screen in the
courtroom unless it was necessary to explain how items were found at the crime scene or for the
medical examiner to explain the victim’s injuries. The court also required both the State and defense
to remove the enlarged image from the jury’s view immediately after it was longer necessary for the
witness’s testimony. It is unclear whether the original exhibits are color photographs but the copies
of the exhibits in the appellate record are black and white. 
            The photos are undeniably gruesome but that fact alone does not render the probative value
of the exhibits outweighed by any unfair prejudice. See Narvaiz v. State, 840 S.W.2d 415, 430
(Tex.Crim.App. 1992). The exhibits merely depict the crime scene and the condition of the victim’s
body due to Appellant’s actions. See Williams, 301 S.W.3d at 693 (noting that close-up photos of
injuries were gruesome but they portrayed no more than the gruesomeness of the injuries inflicted
by the defendant); Narvaiz, 840 S.W.2d at 430 (the photographs, although gruesome, merely depict
the gruesomeness of the crime scene as found by the police). The photographs have additional
probative value in that they depict the efforts undertaken by Appellant to hide the crime, dispose of
the body, and prevent identification of the victim by removal of her tattoos. It was not outside the
zone of reasonable disagreement for the trial court to conclude that the danger of unfair prejudice
did not substantially outweigh the probative value of the photographs. Accordingly, we find that the
trial court did not abuse its discretion by admitting State’s Exhibits 9, 10, 15, 16, 17, and 19. We
overrule Issue Three and affirm the judgment of the trial court.


March 9, 2011                                                             
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)